1  CROSNER LEGAL, P.C.
   Craig W. Straub (SBN 249032)
2  craig@crosnerlegal.com
   Jennifer L. MacPherson (SBN 202021)
3  jmacpherson@crosnerlegal.com
   9440 Santa Monica Blvd. Suite 301
4  Beverly Hills, CA 90210
   Tel: (866) 276-7637
5  Fax: (310) 510-6429

6  Attorneys for Plaintiff

7

8              UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10  SHERI TUCKER, individually, and on        Case No. 3:25-cv-04003-MMC
    behalf of all others similarly situated,
11                                            **FIRST AMENDED CLASS ACTION
                  Plaintiff,                  COMPLAINT FOR**:
12
                  v.                          (1) Violations of the Consumers Legal
13                                                Remedies Act, Cal. Civ. Code §§ 1750, *et
    WALGREEN CO.,                                 seq.*;
14                                            (2) Violations of the Unfair Competition Law,
                  Defendant.                      Cal. Bus. & Prof. Code §§17200, *et seq.*;
15                                                and
                                              (3) Breach of Implied Warranties
16
                                              JURY TRIAL DEMANDED
17

18

19

20

21

22

23

24

25

26

27

28

CROSNER LEGAL, P.C.

Plaintiff Sheri Tucker ("Plaintiff") brings this action against Defendant Walgreen Co. ("Walgreens" or "Defendant"), individually and on behalf of all others similarly situated, and alleges upon personal knowledge as to Plaintiff's acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by Plaintiff's attorneys.

## NATURE OF THE ACTION

1.      Defendant sells a line "Perfection Silk" Tampons (the "Tampons" or "Products").[1]

2.      The problem is the Tampons contain lead which is a known health hazard that poses an unreasonable health threat.

3.      There are no "safe" levels of lead. The World Health Organization ("WHO") states: "There is no level of exposure to lead that is known to be without harmful effects."[2]

4.      The U.S. Centers for Disease Control and Prevention ("CDC") states: "There are no safe levels of lead in the blood."[3]

5.      The U.S. Food & Drug Administration ("FDA")[4] states "there is no known safe level of exposure to lead …"[5]

---

[1] The "Perfection Silk" Tampons are all substantially similar and come in the following sizes: Light, Regular, Super, and Super Plus.

[2] World Health Organization, *Lead Poisoning* (Aug. 11, 2023), *available at* https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health (emphasis in original)

[3] S. Centers for Disease Control and Prevention, *About Childhood Lead Poisoning Prevention* (May 23, 2024), *available at* https://www.cdc.gov/lead-prevention/about/index.html

[4] Here, Plaintiff alleges that Defendant's "free from" labeling representations (see below) are misleading which is not a technical area in which the FDA has greater technical expertise than the courts. Any FDA decision about Defendant's lead contaminated Tampons, which is doubtful to be issued by the FDA, will not resolve the issue raised for Plaintiff's misrepresentation claim. There is no indication from the FDA that it will provide an opinion as to an unreasonable safety risk created by any particular tampon, let alone for Defendant's Tampons.

[5] S. Food & Drug Administration, Lead in Food and Foodwares (July 25, 2024), *available at* https://www.fda.gov/food/environmental-contaminants-food/lead-food-and-foodwares

CROSNER LEGAL. P.C.

6.    Lead affects numerous organs and systems in the body and accumulates over time. This leads to health risks and toxicity, including hindering neurological function, anemia, and kidney damage.[6]

7.    Defendant represents that the Tampons are "**FREE FROM** CHLORINE, FRAGRANCES, DYES" and "The tampon core is free from elemental chlorine, dyes, fragrances" but fails to disclose that the tampons contain high levels of heavy metals, including lead.



---

[6] Wani AL, *et al*., *Lead toxicity: a review*, INTERDISCIP TOXICOL. (June 2015), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4961898

FIRST AMENDED CLASS ACTION COMPLAINT

CROSNER LEGAL. P.C.



8.      These "FREE FROM" statements give the reasonable consumer the belief that the Products are safe to use and "free from" harmful substances such as lead.

9.      These "FREE FROM" representations mislead reasonable consumers because a reasonable consumer would interpret such statements to mean the Tampons are free from harmful elements such as lead.

10.     Tampons, a commonly used feminine hygiene product, with 50–86% of women in the United States report using them during menstruation, are inserted into the vagina to absorb menstrual blood.[7]

---

[7] Singh J, Mumford SL, Pollack AZ, Schisterman EF, Weisskopf MG, Navas-Acien A, Kioumourtzoglou MA. *Tampon use, environmental chemicals and oxidative stress in the BioCycle study*. Environ Health. 2019 Feb 11;18(1):11.

11.    "Exposure to lead and lead chemicals can occur through inhalation, ingestion, dermal absorption, absorption from retained or embedded leaded foreign body, and trans-placental (endogenous) routes."[8]

12.    "Lead is stored in the bone for decades, causing long-term internal exposure."[9] "Lead is a toxic substance that poses a variety of dangers for humans. Lead has been shown to affect virtually every organ and/or system in the body in both humans and animals."[10]

13.    "Long-time exposure to lead has been reported to cause anaemia, along with an increase in blood pressure, and that mainly in old and middle aged people."[11]

14.    "Severe damage to the brain and kidneys, both in adults and children, were found to be linked to exposure to heavy lead levels resulting in death. In pregnant women, high exposure to lead may cause miscarriage."[12]

15.    Here, the exposure to lead is harmful because the Products are inserted vaginally where the lead can be directly absorbed into the blood stream. Further, the Tampons are repeatedly used which allows the lead to build up in the body over time.

16.    Vulvar and vaginal tissues are more hydrated and permeable compared to the skin on the rest of the body which may make these more sensitive to lead exposure. *See* Miranda Farage, Howard I. Maibach. *The vulvar epithelium differs from the skin: implications for cutaneous testing to address topical vulvar exposures*. CONTACT DERMATITIS. 2004

---

[8] U.S. Department of Health & Human Services, Agency for Toxic Substances and Disease Registry, *What Are Routes of Exposure to Lead?* (May 24,2023), *available at* https://www.atsdr.cdc.gov/csem/leadtoxicity/exposure_routes.html

[9] Oregon.gov. *Health Effects of Lead Exposure, available at* www.oregon.gov/oha/PH/HEALTHYENVIRONMENTS/HEALTHYNEIGHBORHOODS/LEADPOISONING/MEDICALPROVIDERSLABORATORIES/Documents/introhealtheffectsmedicalprovider.pdf

[10] *Id.*

[11] *Supra* note 6.

[12] *Id.*

CROSNER LEGAL, P.C.

oct;51(4):201-209 ("Vulvar tissue is more permeable than exposed skin due to differences in structure, occlusion, hydration and susceptibility to friction.").

17.     The vaginal epithelium is comprised of a mucosal membrane that is permeable to a range of compounds with several folds that increase the surface area.[13]

18.     The vagina is well-vascularized and chemicals absorbed by the vagina bypass first-pass metabolism by the liver and directly enter systemic circulation.[14]

19.     As such, the vagina is an effective delivery route of drugs to the systemic circulation system which shows that it could also effectively deliver other unwanted compounds, like toxic lead, to the circulation. In a peer-reviewed article titled *The vagina as a route for systemic drug delivery*, the researchers note that the "presence of dense network of blood vessels has made the vagina an excellent route of drug delivery for both systemic and local effect."[15]

20.     A clinical study examining the difference between estradiol administration by vaginal administration and oral administration found that "[s]erum estradiol levels were significantly higher with vaginally administered estradiol than with orally administered estradiol."[16]

21.     A published peer-reviewed clinical trial examined whether volatile organic compounds (VOCs) present in tampons in trace amounts could leach into the body.[17] The researchers from the University of Michigan's School of Public Health measured urinary concentrations of 98 target VOCs in 25 reproductive-aged women with 100 repeated measures

---

[13] Hussain A, Ahsan F. *The vagina as a route for systemic drug delivery*. J CONTROL RELEASE. 2005;103(2):301–13. doi: 10.1016/j.jconrel.2004.11.034.

[14] *Id*.

[15] *Id*.

[16] David E. Tourgeman, MD · Elisabet Gentzchein, BSc · Frank Z. Stanczyk, PhD · Richard J. Paulson, MD. *Serum and tissue hormone levels of vaginally and orally administered estradiol*. AMERICAN JOURNAL OF OBSTETRICS & GYNECOLOGY. 1999;180(6):1480-1483.

[17] *See* Ding N, Lin N, Batterman S, Park SK. *Feminine Hygiene Products and Volatile Organic Compounds in Reproductive-Aged Women Across the Menstrual Cycle: A Longitudinal Pilot Study*. J WOMENS HEALTH (LARCHMT). 2022 Feb;31(2):210-218.

CROSNER LEGAL, P.C.

collected between October 2018 and February 2019. First-morning-void urine samples were collected four times for each woman during one menstrual cycle. Urinary VOC concentrations were measured using gas chromatography-mass spectroscopy. The authors found that "tampon users had significantly higher concentrations of 2-butanone ($\beta$ = 1.58 log ng/g, 95% confidence interval [CI]: 0.16-3.00, p = 0.03) and methyl isobutyl ketone ($\beta$ = 0.63 log ng/g, 95% CI: 0.03-1.22, p = 0.04), compared with pad users. Higher n-nonane, benzene, and toluene estimated from menstrual products were associated with higher urinary concentrations in women."

22.     This makes sense because the vaginal route allows for direct systemic absorption, bypassing first-pass metabolism (i.e., liver detoxification that occurs when substances are ingested orally). Recent published science states "Lead, a toxin with no known safety levels, can leach from tampons and enter the circulation, remaining in bone tissue and body for decades."[18] The authors note: "The scientific community must prioritize research into alternative, safer materials for feminine hygiene products, and the manufacturers must ensure rigorous testing and quality control measures. These steps are crucial for safeguarding women's health."[19]

23.     Chronic metal absorption, particularly of lead, has been linked to an increased risk of cancer, infertility, dementia, and other health issues.[20]

24.     Thus, the lead in the Products create an unreasonable safety hazard because the Tampons are absorbent cylinders made of cotton/rayon that are inserted into the vagina to absorb menstrual blood. The vagina absorbs chemicals more easily than other parts of the body, and there is no safe level for lead. Because any amount of lead in the body is not safe, the amount of lead in the Tampons creates an unreasonable safety hazard for consumers.

---

[18] Fatima Z, Kakar AI, M A. Heavy metal contamination in tampons: A hidden public health concern. Environ Anal Health Toxicol. 2025 Mar;40(1):e2025003-0. doi: 10.5620/eaht.2025003. Epub 2025 Jan 22. PMID: 40400432; PMCID: PMC12188301.

[19] *Id.*

[20] University of California, Berkeley, Public Health, *First study to measure toxic metals in tampons shows arsenic and lead, among other contaminants* (July 3, 2024), *available at* https://publichealth.berkeley.edu/news-media/research-highlights/first-study-to-measure-toxic-metals-in-tampons-shows-arsenic-and-lead

CROSNER LEGAL, P.C.

CROSNER LEGAL, P.C.

25.    Independent testing of the "regular" size Tampons performing a quantitative analysis of Lead, Arsenic, and Mercury by Inductively Couple Plasma Mass Spectrometry utilizing EPA 3052 (ICPMS-QNT-EL-HM) found that the Tampons contained 0.153 ug/g of lead:

| **SAMPLE ID:** | LOT:3121.12.12 |
| | Perfection Silk Tampons Unscented, Regular/Super Absorbency |

**ANALYSIS:** Quantitative analysis of Lead, Cadmium, Arsenic, and Mercury by Inductively Couple Plasma Mass Spectrometry utilizing EPA 3052 (ICPMS-QNT-EL-HM)

| **RESULTS:** | Element | | Result |
| --- | --- | --- | --- |
| | **As** | Sample | ND |
| | | Duplicate | ND |
| | | **Mean** | N/A |
| | **Cd** | Sample | ND |
| | | Duplicate | ND |
| | | **Mean** | N/A |
| | **Pb** | Sample | 0.155 ug/g |
| | | Duplicate | 0.152 ug/g |
| | | **Mean** | **0.153 ug/g** |
| | **Hg** | Sample | 0.001 ug/g |
| | | Duplicate | 0.001 ug/g |
| | | **Mean** | **0.001 ug/g** |

ND = Not Detected at LOQ of < 0.01 ug/g for As & Cd and < 0.001 ug/g for Hg & Pb

26.    The ICP-MS-QNT-EL-HM (Inductively Coupled Plasma Mass Spectrometry – Quantitative, Elemental Analysis, High Matrix) method is designed for the accurate determination of metals, including lead, in various types of samples. It is recognized for its high sensitivity and precision in measuring trace levels of metals, including lead.

27.    The testing was conducted by a laboratory with over two and a half decades of expertise in consumer product chemistry and phytoforensic science.  The laboratory is located in the United States. The testing was performed in September/August of 2024 and a report was generated (as shown above) on August 6, 2024.

28.    The "HM" means the test method is tailored to handle high matrix samples. It is designed to analyze complex or concentrated sample matrices with accuracy. The "QNT"

FIRST AMENDED CLASS ACTION COMPLAINT

CROSNER LEGAL, P.C.

designation indicates that the method is focused on quantitative analysis. It is designed to provide precise and reliable concentration measurements of lead. The "EL" stands for elemental analysis, affirming that the method is specifically designed for determining the concentration of elements like lead.

29.      The testing results of the "regular" size tampon can be extrapolated to all Tampons since the Tampons are sourced and manufactured at the same location and use the same materials. The manufacturing process for the Tampions is standardized. That is, the materials and conditions of the manufacturing process for one Tampon is the same for all Tampons.

30.      Defendant knew, or should have known, that the Products contained lead and either willfully or intentionally failed to disclose this fact to consumers.

31.      Defendant owed consumers a duty of care to adequately test its Products for heavy metals and if found, to remediate or disclose their presence.

32.      Plaintiff alleges that the "Free From" representations and the failure to disclose the presence of lead in Defendant's Products constitute a violation of California's Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*, violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.,* and breach implied warranties.

### JURISDICTION AND VENUE

33.      Defendant claims this Court has jurisdiction pursuant to pursuant to 28 U.S.C. § 1332(a). ECF No.  1 at 3.

34.      This Court has personal jurisdiction over Defendant because Defendant conducts and transacts business in the State of California, contracts to supply goods within the State of California, and supplies goods within the State of California. Defendant maintains and operates approximately 580 retails retail stores in California during the proposed class period.[21] Defendant has intentionally availed itself of the markets within California through its

---

[21] https://www.latimes.com/business/story/2024-10-15/walgreens-sees-finances-stabilize-with-plan-to-close-1200-stores#

advertising, marketing, and sales of the Tampons to consumers, including Plaintiff.

35.    Venue is proper in this District pursuant to because Defendant engages in continuous and systematic business activities within the State of California. Venue is further proper pursuant to because a substantial part of the events or omissions giving rise to the claim occurred in this District and Defendant removed the action to this Court from Alameda County Superior Court.. Venue is also proper in this District pursuant to Cal. Civ Code. § 1780(c) because Defendant is doing business in this District, and Plaintiff purchased a Tampon at issue in this District.

### PARTIES

36.    Defendant Walgreen Co. has its principal place of business in Illinois. It maintains a registered agent for service of process in California at 1505 Corporation Service d/b/a CSC Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Sacramento, CA.

37.    Plaintiff is a resident of Alameda County, California. Plaintiff purchased the "Perfection Silk" Tampons in regular, super, and super plus absorbencies during the class period at retail stores in and around Alameda County. Plaintiff relied on Defendant's representations that the tampons were free from harmful substances such as lead. Plaintiff paid approximately $8 for a 36-count package of the Tampons at the Walgreens retail store located in San Leandro, CA numerous times during the class period.

38.    Plaintiff was not aware the Tampons contained lead.  After reading the label, Plaintiff purchased the Tampons on the assumption that the labeling was accurate, and that the Tampons did not contain known harmful substances like lead. Plaintiff would not have purchased the Tampons had she known the Tampons contain lead, a substance which is known to be hazardous to human health. As a result, Plaintiff suffered injury in fact when she spent money to purchase the Tampons she would not have purchased absent Defendant's misconduct.

39.    Plaintiff continues to see the Tampons for sale at retail stores near her home and desires to purchase the Tampons again if the Tampons did not contain lead. However, as a result of Defendant's ongoing misrepresentations and material omissions, Plaintiff is unable to rely on the Tampons' labeling when deciding in the future whether to purchase the Tampons.

CROSNER LEGAL, P.C.

40.    Plaintiff is not a consumer products manufacturing expert, does not know if or when Defendant has reformulated the Products, and may reasonably, but incorrectly, assume the Tampons were improved or reformulated to no longer contain lead which creates an imminent risk of injury (i.e., loss of money from the purchase of the Tampons).

41.    Plaintiff did not notice any disclaimer, qualifier, or other explanatory statement or information on the Tampons' labeling or packaging that disclosed that the Tampons contained lead. At the time of Plaintiff's purchases, she did not know the Tampons contained lead.

42.    Since consumers were deprived of making the informed choice between Defendant's Tampons and other menstrual products that do not contain lead, Plaintiff and other consumers have suffered economic injury based on the purchase price of the Products.

**REASONABLE CONSUMERS ARE DECEIVED BY DEFENDANT'S MISREPRESENTATIONS AND OMISSIONS**

43.    Consumers, like Plaintiff, relied on Defendant's labeling statements set forth above, including the "Free From" statement on the Product packaging. The net-effect or net-impression of the Tampons' labeling on consumers is that the Tampons do not contain harmful ingredients like lead.

44.    Consumers, like Plaintiff, want to know if a Tampon they place inside their body contains substances which are hazardous to their health. Defendant is aware of this as it labels the Product as free from other chemicals, such as elemental chlorine, dyes, and fragrances. Defendant's nondisclosure of the lead in the Tampons is material because reasonable consumers would deem the presence of lead in the Tampons to be important in determining whether to purchase the Tampons.

45.    Defendant has exclusive knowledge that the Tampons contain lead. The fact that Defendant's Tampons contain lead is not reasonably accessible to Plaintiff and consumers. Consumers, like Plaintiff, trust that Tampons they purchase do not contain toxic heavy metals like lead.

CROSNER LEGAL. P.C.

46.    Defendant has a duty to disclose the presence of lead in the Tampons because the fact is known to Defendant (that the Tampons contain lead), and the failure to disclose the lead in the Tampons is misleading.

47.    The lead in the Tampons implicates a health concern that is important to reasonable consumers when deciding to purchase Defendant's Tampons. Defendant has actively concealed the levels of lead in the Tampons from Plaintiff and putative Class Members.

48.    A failure to disclose a fact constitutes actionable conduct if the omission goes to the central function of the Tampon. Here, the Tampons' central function is for people to safely use the Tampons. Lead-tainted Tampons do not serve their central function.

49.    Reasonable consumers, like Plaintiff, would deem it important in determining whether to purchase the Tampons because Plaintiff would not have purchased the Tampons had she known that harmful elements like lead were in the Tampons. That is, the omission of the lead content of the Tampons was material because a reasonable consumer would deem it important in determining how to act in the transaction at issue.

50.    A failure to disclose a fact constitutes actionable conduct if the omission causes an unreasonable safety hazard. Here, it is not reasonable to sell a Tampon that consumers put inside their body that contains substantial levels of lead. As explained above, lead is a safety hazard because it causes several negative health effects in humans.

51.    Defendant also made partial representations that the Tampons are safe, including the statement "free from elemental chlorine, fragrances, and dyes," which creates the net-impression that the Tampons did not contain potentially harmful ingredients like lead. These partial disclosures are misleading because the lead content of the Tampons was not disclosed.

**PLAINTIFF AND THE PUTATIVE CLASS MEMBERS SUFFERED ECONOMIC INJURY**

52.    Plaintiff and putative Class members suffered economic injury as a result of Defendant's actions. Plaintiff and putative Class members spent money that, absent Defendant's actions, they would not have spent. With the other Tampons on the market without lead, a reasonable consumer would choose to purchase a Tampon without lead and not Defendant's Tampons.

CROSNER LEGAL, P.C.

53.    Plaintiff and putative Class members are entitled to damages and restitution for the purchase price of the Tampons that were defective, not merchantable, and not fit for their represented purpose.

54.    Consumers, including Plaintiff, would not have purchased Defendant's Tampons if they had known the Tampons contain lead, a substance which has known adverse health effects on humans. Defendant did not disclose that the Tampons contain lead.

55.    Accordingly, Plaintiff brings this action individually and on behalf of other similarly situated consumers to halt the dissemination of Defendant's deceptive advertising message, correct the deceptive perception it has created in the minds of consumers, and obtain redress for those who have purchased the Tampons. As a consequence of Defendant's deceptive labeling and material omissions, Plaintiff alleges Defendant has violated and is violating California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq*. (the "CLRA"), California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq*. (the "UCL") and constitutes a breach of implied warranties.

### NO ADEQUATE REMEDY AT LAW

56.    Plaintiff and members of the class are entitled to equitable relief as no adequate remedy at law exists. The statutes of limitations for the causes of action pled herein vary. Class members who purchased the Tampons more than three years prior to the filing of the complaint will be barred from recovery if equitable relief were not permitted under the UCL.

57.    The scope of actionable misconduct under the unfair prong of the UCL is broader than the other causes of action asserted herein. It includes Defendant's overall unfair marketing scheme to promote and brand the Tampons, across a multitude of media platforms, including the Tampon labels and packaging, over a long period of time, in order to gain an unfair advantage over competitor Tampons.

58.    Plaintiff and Class members may also be entitled to restitution under the UCL, while not entitled to damages under other causes of action asserted herein (e.g., the CLRA is limited to certain types of plaintiffs (an individual who seeks or acquires, by purchase or lease,

CROSNER LEGAL, P.C.

1  any goods or services for personal, family, or household purposes) and other statutorily

2  enumerated conduct).

3      59.    The UCL also creates a cause of action for violations of law (such as statutory or

4  regulatory requirements and court orders related to similar representations and omissions made

5  on the type of products at issue). This is especially important here because Plaintiff alleges

6  Defendant has committed "unlawful" acts and brings a claim for violation of the UCL's

7  "unlawful prong." Specifically, Defendant has violated California's Safe Drinking Water and

8  Toxic Enforcement Act of 1986, Cal. Health & Safety Code § 25249.5, *et seq.* No other causes

9  of action allow this claim to proceed, and thus, there is no adequate remedy at law for this

10  specific violation of the UCL's unlawful prong. Plaintiff's UCL unlawful prong claim does not

11  rest on the same conduct as her other causes of action, and there is no adequate remedy at law

12  for this specific unlawful claim.

13      60.    Injunctive relief is a primary goal of this action in the form of a labeling change

14  or product formulation change. Unless Defendant is enjoined from failing to disclose the

15  presence of lead in the future, Plaintiffs will not be able to determine if there is lead or not in the

16  Tampons.

17      61.    Injunctive relief is appropriate on behalf of Plaintiff and members of the class

18  because Defendant continues to omit material facts about the Tampons. Injunctive relief is

19  necessary to prevent Defendant from continuing to engage in the unfair, fraudulent, and/or

20  unlawful conduct described herein and to prevent future harm—none of which can be achieved

21  through available legal remedies (such as monetary damages to compensate past harm).

22      62.    Injunctive relief, in the form of affirmative disclosures, a change in

23  manufacturing processes, or halting the sale of unlawfully sold Tampons is necessary to dispel

24  the public misperception about the Tampons that has resulted from years of Defendant's unfair,

25  fraudulent, and unlawful marketing efforts. Such disclosures would include, but are not limited

26  to, publicly disseminated statements that the Tampons contain lead; and/or requiring prominent

27  qualifications and/or disclaimers on the Tampons' front label concerning the Tampons' true

28  nature.

CROSNER LEGAL, P.C.

63.    An injunction is not available through a legal remedy (such as monetary damages). In addition, Plaintiff is currently unable to accurately quantify the damages caused by Defendant's future harm, because discovery and Plaintiff's investigation have not yet completed, rendering injunctive relief necessary. Further, because a public injunction is available under the UCL and damages will not adequately benefit the general public in a manner equivalent to an injunction.

64.    It is premature to determine whether an adequate remedy at law exists. This is an initial pleading, and discovery has not yet commenced and/or is at its initial stages. No class has been certified yet. No expert discovery has commenced and/or completed. The completion of fact/non-expert and expert discovery, as well as the certification of this case as a class action, are necessary to finalize and determine the adequacy and availability of all remedies, including legal and equitable, for Plaintiff's individual claims and any certified class or subclass.

65.    Remedies at law are not equally efficient and quick. The need to schedule a jury trial will result in delay. A jury trial takes longer and is more expensive compared to a bench trial.

66.    Plaintiff therefore reserves her right to amend this complaint and/or assert additional facts that demonstrate this Court's jurisdiction to order equitable remedies where no adequate legal remedies are available for either Plaintiff and/or any certified class or subclass. Such proof, to the extent necessary, will be presented prior to the trial of any equitable claims for relief and/or the entry of an order granting equitable relief.

**CLASS ACTION ALLEGATIONS**

67.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of the following Class:

> All persons who purchased the Tampons for personal use in California within the applicable statute of limitations until the date class notice is disseminated.

68.    Excluded from the class are: (i) Defendant and its officers, directors, and employees; (ii) any person who files a valid and timely request for exclusion; and (iii) judicial officers and their immediate family members and associated court staff assigned to the case.

CROSNER LEGAL, P.C.

69.     Plaintiff reserves the right to amend or otherwise alter the class definition presented to the Court at the appropriate time, or to propose or eliminate sub-classes, in response to facts learned through discovery, legal arguments advanced by Defendant, or otherwise.

70.     The Class is appropriate for certification because Plaintiff can prove the elements of the claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

71.     <u>Numerosity</u>: Class members are so numerous that joinder of all members is impracticable. Plaintiff believes that there are thousands of consumers who are Class members described above who have been damaged by Defendant's deceptive and misleading practices.

72.     <u>Commonality</u>: There is a well-defined community of interest in the common questions of law and fact affecting all Class members. The questions of law and fact common to the Class members which predominate over any questions which may affect individual Class members include, but are not limited to:

a.      Whether Defendant is responsible for the conduct alleged herein which was uniformly directed at all consumers who purchased the Tampons;

b.      Whether Defendant's misconduct set forth in this Complaint demonstrates that Defendant engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of the Tampons;

c.      Whether Defendant made material omissions concerning the Tampons that were likely to deceive the public;

d.      Whether Plaintiff and the Class are entitled to injunctive relief;

e.      Whether Plaintiff and the Class are entitled to money damages and/or restitution under the same causes of action as the other Class members.

73.     <u>Typicality</u>: Plaintiff is a member of the Class that Plaintiff seeks to represent. Plaintiff's claims are typical of the claims of each Class Member in that every member of the Class was susceptible to the same deceptive, misleading conduct and purchased the Tampons. Plaintiff is entitled to relief under the same causes of action as the other Class members.

CROSNER LEGAL, P.C.

74.   <u>Adequacy</u>: Plaintiff is an adequate Class representative because Plaintiff's interests do not conflict with the interests of the Class members Plaintiff seeks to represent; the consumer fraud claims are common to all other members of the Class, and Plaintiff has a strong interest in vindicating the rights of the Class; Plaintiff has retained counsel competent and experienced in complex class action litigation and Plaintiff intends to vigorously prosecute this action. Plaintiff has no interests which conflict with those of the Class. The Class members' interests will be fairly and adequately protected by Plaintiff and proposed Class Counsel. Defendant has acted in a manner generally applicable to the Class, making relief appropriate with respect to Plaintiff and the Class members. The prosecution of separate actions by individual Class members would create a risk of inconsistent and varying adjudications.

75.   The Class is properly brought and should be maintained as a class action because a class action is superior to traditional litigation of this controversy. A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

a.   The joinder of hundreds of individual Class members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

b.   The individual claims of the Class members may be relatively modest compared with the expense of litigating the claim, thereby making it impracticable, unduly burdensome, and expensive to justify individual actions;

c.   When Defendant's liability has been adjudicated, all Class members' claims can be determined by the Court and administered efficiently in a manner far less burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

d.   This class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;

e.   Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;

f.   This class action will assure uniformity of decisions among Class members;

g.   The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation; and

1    h.    Class members' interests in individually controlling the prosecution of separate

2  actions is outweighed by their interest in efficient resolution by single class action.

3    76.    Additionally or in the alternative, the Class also may be certified because

4  Defendant has acted or refused to act on grounds generally applicable to the Class thereby

5  making final declaratory and/or injunctive relief with respect to the members of the Class as a

6  whole, appropriate.

7    77.    Plaintiff seeks preliminary and permanent injunctive and equitable relief on

8  behalf of the Class, on grounds generally applicable to the Class, to enjoin and prevent

9  Defendant from engaging in the acts described, and to require Defendant to provide full

10  restitution to Plaintiff and Class members.

11    78.    Unless the Class is certified, Defendant will retain monies that were taken from

12  Plaintiff and Class members as a result of Defendant's wrongful conduct. Unless a classwide

13  injunction is issued, Defendant will continue to commit the violations alleged and the members

14  of the Class and the general public will continue to be misled.

15  **FIRST CLAIM FOR RELIEF**

16  **Violation of California's Consumers Legal Remedies Act**

17  **Cal. Civ. Code §§ 1750 *et seq.***

18    79.    Plaintiff realleges and incorporates by reference all allegations contained in this

19  complaint, as though fully set forth herein.

20    80.    Plaintiff brings this claim under the CLRA individually and on behalf of the Class

21  against Defendant.

22    81.    At all times relevant hereto, Plaintiff and the members of the Class were

23  "consumer[s]," as defined in California Civil Code section 1761(d).

24    82.    At all relevant times, Defendant constituted a "person," as defined in California

25  Civil Code section 1761(c).

26    83.    At all relevant times, the Tampons manufactured, marketed, advertised, and sold

27  by Defendant constituted "goods," as defined in California Civil Code section 1761(a).

28

CROSNER LEGAL, P.C.

1    84.    The purchases of the Tampons by Plaintiff and the members of the Class were

2    and are "transactions" within the meaning of California Civil Code section 1761(e).

3    85.    Defendant disseminated, or caused to be disseminated, through their advertising,

4    false and misleading representations, including the Tampons' labeling that they do not contain

5    hazardous substances such as lead. Defendant fails to disclose that the Tampons contain high

6    amounts of lead. This is a material omission as reasonable consumers would find the fact that

7    the Tampons contain lead to be important to their decision in purchasing the Tampons.

8    Defendant's representations violate the CLRA in the following ways:

9        a)    Defendant represented that the Tampons have characteristics, ingredients, uses,

10   and benefits which they do not have (Cal. Civ. Code § 1770(a)(5));

11       b)    Defendant represented that the Tampons are of a particular standard, quality, or

12   grade, which they are not (Cal. Civ. Code § 1770(a)(7));

13       c)    Defendant advertised the Tampons with an intent not to sell the Tampons as

14   advertised (Cal. Civ. Code § 1770(a)(9)); and

15       d)    Defendant represented that the subject of a transaction has been supplied in

16   accordance with a previous representation when it has not (Cal. Civ. Code § 1770(a)(16)).

17   86.    Defendant violated the CLRA because the Tampons contain lead. Defendant

18   knew or should have known that consumers would want to know that the Tampons contain lead.

19   Defendant had a duty to disclose that the Tampons contain lead.

20   87.    Based on the statutory text, legislative history (which includes the National

21   Consumer Act), the judicial decisions and statutes that existed when the CLRA was enacted, the

22   subsequent case law, and the many amendments to the CLRA from 1975 through 2016, failures

23   to disclose material facts are actionable under the CLRA. In particular, subdivision (a)(5), (7),

24   and (9) of Civil Code section 1770 proscribe material omissions.

25   88.    Defendant's labeling of the Tampons also created the net-impression that the

26   Tampons do not contain hazardous substances such as lead. Defendant had exclusive knowledge

27   of the material fact that the Tampons contain lead, and Defendant failed to disclose this fact.

28   Defendant actively concealed this material fact. The fact that the Tampons contain lead is

CROSNER LEGAL, P.C.

material to consumers because reasonable consumers would deem the existence of lead in a Tampon that they place inside their body important in determining whether to buy the Tampons.

89.    Defendant's actions as described herein were done with conscious disregard of Plaintiff and the Class members' rights and were wanton and malicious.

90.    Defendant's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA, since Defendant is still representing that the Tampons have characteristics which they do not have.

91.    Pursuant to California Civil Code section 1782(d), Plaintiff and the members of the Class seek an order enjoining Defendant from engaging in the methods, acts, and practices alleged herein.

92.    Pursuant to California Civil Code section 1782, Plaintiff notified Defendant in writing by certified mail of the alleged violations of the CLRA and demanded that Defendant rectify the problems associated with the actions detailed above and give notice to all affected consumers of their intent to so act. Defendant failed to rectify or agree to rectify the problems associated with the actions detailed herein and give notice to all affected consumers within 30 days of the date of written notice pursuant to section 1782 of the CLRA. Thus, Plaintiff seeks actual, punitive, and statutory damages, as appropriate.

93.    Pursuant to section 1780(d) of the CLRA, below is an affidavit showing that this action was commenced in a proper forum.

### SECOND CLAIM FOR RELIEF

**Violation of California's Unfair Competition Law**

**Cal. Bus. & Prof. Code §§ 17200 *et seq.***

94.    Plaintiff realleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

95.    Plaintiff brings this claim under the UCL individually and on behalf of the Class against Defendant.

96.    The UCL prohibits any "unlawful," "fraudulent," or "unfair" business act or practice and any false or misleading advertising.

CROSNER LEGAL, P.C.

97.     Defendant committed "unlawful" business acts or practices by making the representations and omitted material facts (which constitutes advertising within the meaning of California Business & Professions Code section 17200), as set forth more fully herein, and violating California Civil Code sections 1573, 1709, 1711, 1770(a)(5), (7), (9) and (16), California Business & Professions Code section 17500 *et seq.*, California common law breach of implied warranties, and California's Safe Drinking Water and Toxic Enforcement Act of 1986 ("Proposition 65"), Cal. Health & Safety Code § 25249.5*, et seq.* Plaintiff, individually and on behalf of the other Class members, reserves the right to allege other violations of law, which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this date.

98.     California's Proposition 65 establishes a Maximum Allowable Dose Level ("MADL") of 0.5 ug of lead per day for reproductive toxicity. *See* https://oehha.ca.gov/proposition-65/chemicals/lead-and-lead-compounds. Here, the Tampons contain 0.153 ug/g lead. The Tampon fabric weighs approximately 4 grams. Thus, the Tampon contains approximately 0.613 ug of lead. On average, users of the Tampons use three (3) Tampons per day. Thus, a consumer would be exposed to approximately 1.8 ug of lead per day. The ordinary and expected use of the Products would expose consumers to more than the MADL per day. Based on the daily average use of tampons, consumers are exposed to lead in excess of the MADL, regardless of what size Product they use. This exposure occurs within the body via ordinary use of the Tampon.

99.     Defendant committed "unfair" business acts or practices by: (1) engaging in conduct where the utility of such conduct is outweighed by the harm to Plaintiff and the members of the a Class; (2) engaging in conduct that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiff and the members of the Class; and (3) engaging in conduct that undermines or violates the intent of the consumer protection laws alleged herein. There is no societal benefit from deceptive advertising.

100.     Plaintiff and the other Class members paid for a Tampon that is not as advertised by Defendant. Further, Defendant failed to disclose a material fact (that the Tampons contain

CROSNER LEGAL, P.C.

lead) of which it had exclusive knowledge. While Plaintiff and the other Class members were harmed, Defendant was unjustly enriched by its false misrepresentations and material omissions. As a result, Defendant's conduct is "unfair," as it offended an established public policy. There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein. For example, Defendant's competitors do not sell tampons that contain lead.

101. Defendant committed "fraudulent" business acts or practices by making the representations of material fact regarding the Tampons set forth herein. Defendant's business practices as alleged are "fraudulent" under the UCL because they are likely to deceive customers into believing the Tampons do not contain lead.

102. Plaintiff and the other members of the Class have in fact been deceived as a result of their reliance on Defendant's material representations and omissions. This reliance has caused harm to Plaintiff and the other members of the Class, each of whom purchased Defendant's Tampons. Plaintiff and the other Class members have suffered injury in fact and lost money as a result of purchasing the Tampon and Defendant's unlawful, unfair, and fraudulent practices.

103. Defendant's wrongful business practices and violations of the UCL are ongoing.

104. Plaintiff and the Class seek pre-judgment interest as a direct and proximate result of Defendant's unfair and fraudulent business conduct. The amount on which interest is to be calculated is a sum certain and capable of calculation, and Plaintiff and the Class seek interest in an amount according to proof.

105. Unless restrained and enjoined, Defendant will continue to engage in the above-described conduct. Accordingly, injunctive relief is appropriate.

106. Pursuant to California Business & Professions Code section 17203, Plaintiff, individually and on behalf of the Class, seek (1) restitution from Defendant of all money obtained from Plaintiff and the other Class members as a result of unfair competition; (2) an injunction prohibiting Defendant from continuing such practices that do not comply with the law; and (3) all other relief this Court deems appropriate, consistent with California Business & Professions Code section 17203.

FIRST AMENDED CLASS ACTION COMPLAINT

1

CROSNER LEGAL, P.C.

**THIRD CLAIM FOR RELIEF**

**Breach of Implied Warranties**

107.    Plaintiff realleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

108.    Plaintiff brings this claim individually and on behalf of the Class against Defendant.

### *Implied Warranty of Fitness For A Particular Purpose*

109.    "An implied warranty of fitness for a particular purpose arises only where (1) the purchaser at the time of contracting intends to use the goods for a particular purpose, (2) the seller at the time of contracting has reason to know of this particular purpose, (3) the buyer relies on the seller's skill or judgment to select or furnish goods suitable for the particular purpose, and (4) the seller at the time of contracting has reason to know that the buyer is relying on such skill and judgment." *Keith v. Buchanan*, 173 Cal. App. 3d 13, 25 (1985).

110.    Defendant was at all relevant times the manufacturer, distributor, and/or warrantor of the Tampons. Defendant knew or had reason to know of the specific use for which its Tampons were purchased.

111.    Defendant, through the acts and omissions set forth herein, in the sale, marketing, and promotion of the Tampons made implied representations to Plaintiff and the Class that the Tampons were fit for the particular purpose of use inside the body. However, the Tampons are hazardous to use inside the body.

112.    Further, Defendant cannot legally sell the Tampon in California without a Proposition 65 disclosure on the labels, and thus, by definition they are not fit for the particular purpose of use inside the body.

### *Implied Warranty of Merchantability*

113.    At the time the Tampons were sold, Defendant knew or should have known that Plaintiff and members of the Class would rely on Defendant's skill and judgment regarding the safety and composition of the Tampons. Because the Tampons contain lead, they are not of the

1    same quality as those generally accepted in the trade and were not fit for the ordinary purposes

2    for which the Tampons are used (i.e., to be placed inside the body).

3        114.    The implied warranty of merchantability "provides for a minimum level of

4    quality" in a good. *Am. Suzuki Motor Corp. v. Superior Court*, 37 Cal. App. 4th 1291, 1296 n.

5    2 (1995).

6        115.    To state a claim for breach of the implied warranty of merchantability, a plaintiff

7    must allege a "fundamental defect that renders the product unfit for its ordinary purpose." *T &*

8    *M Solar & Air Conditioning, Inc. v. Lennox Int'l Inc.*, 83 F. Supp. 3d 855, 878 (N.D. Cal. 2015);

9    *see also Mexia v. Rinker Boat Co.*, 174 Cal. App. 4th 1297, 1303 (2009) ("The core test of

10   merchantability is fitness for the ordinary purpose for which such goods are used."). "Such

11   fitness is shown if the product is in safe condition and substantially free of defects[.]" *Mexia*,

12   174 Cal. App. 4th at 1303.

13       116.    "In cases involving human food, a party can plead that a product violates the

14   implied warranty of merchantability through allegations that the product was unsafe for

15   consumption, contaminated, or contained foreign objects." *Barnes v. Nat. Organics, Inc.*, 2022

16   WL 4283779, at *8 (C.D. Cal. Sept. 13, 2022) (citing *Thomas v. Costco Wholesale Corp.*, 2014

17   WL 5872808, *3 (N.D. Cal. Nov. 12, 2014)).

18       117.    Here, like food, the Tampons are placed inside the body. The Tampons contain a

19   dangerous substance which compromises the safety and fitness for placing the Tampons inside

20   the body for extended periods of time.  *See Barnes*, 2022 WL 4283779, at *8 (finding breach of

21   implied warranty sufficiently pleaded where plaintiffs alleged that the product promoted a

22   healthy pregnancy but was actually contaminated with heavy metals and was thus not favorable

23   for pregnancy); *Rodriguez v. Mondelez Glob. LLC*, 703 F.Supp.3d 1191, 1212-13 (S.D. Cal.

24   2023) (same where plaintiffs alleged that the products were unsafe for consumption because

25   they contained high levels of lead or cadmium).

26       118.    By advertising and selling the Tampons at issue, Defendant, a merchant of goods,

27   made promises and affirmations of fact that the Tampons are merchantable and conform to the

28   promises or affirmations of fact made on the Tampon's packaging and labeling, and through its

CROSNER LEGAL, P.C.

marketing and advertising, as described herein. This labeling and advertising, combined with the implied warranty of merchantability, constitute warranties that became part of the basis of the bargain between Plaintiff and members of the Class and Defendant.

119.    Defendant's labeling and advertising, combined with the implied warranty of merchantability, constitute a warranty that the Tampons do not contain hazardous substances such as lead.

120.    In reliance on Defendant's skill and judgment and the implied warranties of fitness for this purpose and merchantability, Plaintiff and members of the Class purchased the Tampon to place inside their body. Defendant knew that the Tampons would be purchased and used without further testing by Plaintiff and Class members.

121.    Consumers are the intended beneficiaries of the implied warranty as they are the ones Defendant made the Tampons for and specifically marketed the Tampons to consumers. Defendant breached the implied warranty of merchantability. Because the Tampons contain lead, they are not fit for ordinary use (i.e., use inside the body).

122.    As a direct and proximate result of Defendant's breach of warranty, Plaintiff and members of the Class were harmed in the amount of the purchase price they paid for the Tampons.

123.    Further, Plaintiff and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Tampon, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiff seeks a monetary award for breach of warranty in the form of damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiff and the Class for the loss of that money, as well as injunctive relief to enjoin Defendant's misconduct to prevent ongoing and future harm that will result.

CROSNER LEGAL, P.C.

CROSNER LEGAL, P.C.

### REQUEST FOR RELIEF

Plaintiff, individually, and on behalf of all others similarly situated, requests for relief pursuant to each claim set forth in this complaint, as follows:

a.    Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as the Class Representative and appointing the undersigned counsel as Class Counsel;

b.    Ordering restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiff and the Class members as a result of Defendant's unlawful, unfair, and fraudulent business practices;

c.    Ordering injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein;

d.    Ordering damages for Plaintiff and the Class;

e.    Ordering Defendant to pay attorneys' fees and litigation costs to Plaintiff and the other members of the Class;

f.    Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded; and

g.    Ordering such other and further relief as may be just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury of all claims in this Complaint so triable.

Dated: July 14, 2025                    CROSNER LEGAL, P.C.

By:        /s/ Craig W. Straub
           CRAIG W. STRAUB

Craig W. Straub (SBN 249032)
craig@crosnerlegal.com
Jennifer L. MacPherson (SBN 202021)
jmacpherson@crosnerlegal.com
9440 Santa Monica Blvd. Suite 301
Beverly Hills, CA 90210
Tel: (866) 276-7637
Fax: (310) 510-6429

Attorneys for Plaintiff

25                      Case No. 3:25-cv-04003-MMC
FIRST AMENDED CLASS ACTION COMPLAINT

1

2

<u>Civil Code Section 1780(d) Affidavit</u>

3

4   I am an attorney duly licensed to practice before all of the courts of the State of

5   California. I am one of the counsel of record for Plaintiffs. This declaration is made pursuant to

6   § 1780(d) of the California Consumers Legal Remedies Act. Defendants have done, and are

7   doing, business in California, including in this district. I declare under penalty of perjury under

8   the laws of the State of California that the foregoing is true and correct.

Executed July 14, 2025 at San Diego, California.

9

By:     */s/ Craig W. Straub*

10                                          CRAIG W. STRAUB

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CROSNER LEGAL, P.C.

FIRST AMENDED CLASS ACTION COMPLAINT